**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| **LOTTOTRON, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | Civ. No. 10-4318 (JLL) |
| | : | |
| v. | : | **REPORT AND RECOMMENDATION** |
| | : | |
| **ATHILA STATION, ET AL.,** | : | |
| | : | |
| **Defendants.** | : | |

---

**HAMMER, United States Magistrate Judge**

## I.   INTRODUCTION

This matter is before the Court by way of plaintiff Lottotron, Inc.'s ("Lottotron" or "plaintiff") application for damages as to three defaulting defendants in the above-captioned matter.  (Pl.'s Br. in Support of Damages, July 6, 2012, ECF No. 211).  In support of its application for damages, plaintiff submitted a brief, the declaration of George C. Summerfield, and exhibits attached thereto.  (See Decl. of George C. Summerfield in Support of Pl.'s Application for Damages ("Summerfield Decl."), July 3, 2012, ECF No. 211-1).

Pursuant to Local Civil Rule 72.1, the Honorable Jose L. Linares, United States District Judge, referred Plaintiff's application for damages to this Court for Report and Recommendation. The Court held a hearing on this matter on October 1, 2012.  For the reasons set forth below, the Court respectfully recommends that judgment be entered against each of the defaulting defendants for damages in the amounts described herein.

1

## II.   BACKGROUND

### A.   Procedural History

On August 19, 2010, plaintiff filed a Complaint alleging patent infringement against various defendants in the United States District Court, District of New Jersey.  (Compl., ECF No. 1).  Specifically, the Complaint alleges that plaintiff is the owner by assignment of U.S. Patent No. 5,921,865, titled *Computerized Lottery Wagering System* ("the '865 patent").  (See id. ¶ 85; Ex. A to Compl.).  The Complaint contends that "[t]he operation of Defendants' on-line, interactive gaming websites directly infringes the claims of the patent in suit in violation of 35 U.S.C. § 271(a)."  (Id. ¶ 86).  Moreover, the Complaint avers that defendants "induced and contributed to the infringement of the claims of the '865 patent by others[,]" which "caused irreparable injury to Lottotron."  (Id. ¶¶ 87-88).  Consequently, plaintiff sought, among other forms of relief, money damages in accordance with 35 U.S.C. § 284.  (Id. at 14-15).

On April 10, 2011, plaintiff filed a motion for default judgment against the following defendants who had failed to answer or otherwise respond to plaintiff's Complaint:  Austant Holdings Ltd., BTK Ltd., Central Pacific Ltd., CyberBetting Ltd., Cyber Gaming International Ltd., Ensis Technologies, Inc., Globetcasino.com, iNetbet Internet Gaming Services ("iNetbet"), Isagro Holdings Ltd., Operia Trading Ltd., Real Entertainment Ltd., Sportscontent Ltd., Story Games Ltd., Sulkin Ltd., Trenan Ltd. ("Trenan"), and Winward Hall Ltd. ("Winward").  (Pl.'s Mot. for Default Judgment, Apr. 10, 2011, ECF No. 131).  Plaintiff provided a Certificate of Service declaring that it served – via the Court's electronic notification system – true and correct copies of its motion for default judgment on the defaulting defendants.  (Pl.'s Certificate of Service, Apr. 10, 2011, ECF No. 131-4).  Because the defaulting defendants did not respond, the

Court granted plaintiff's motion for default judgment solely as to liability, but reserved on the issue of damages.  (Order, May 9, 2011, ECF No. 146).  It ordered plaintiff to "seek guidance from the magistrate judge . . . to determine the appropriate time in which to renew its request for a proof hearing."  (Id.).

Accordingly, after plaintiff settled its dispute with the last remaining active defendant, it requested leave to submit an application for damages as to the defaulting defendants, notifying all counsel of record via e-mail of its request.  (Letter, Apr. 25, 2012, ECF No. 209).  The Court granted that request, and ordered plaintiff to provide a copy of the June 14, 2012, Order on the defaulting defendants within five days from entry of the Order.  (Order, June 14, 2012, ECF No. 210).  On July 6, 2012, plaintiff filed the instant application for damages as to three of the defaulting defendants:  iNetbet, Trenan, and Winward (collectively, for purposes of this Report and Recommendation, "defendants").  (Pl.'s Br. in Support of Damages, July 6, 2012, ECF No. 211).  Plaintiff served the application for damages via the Court's electronic notification system on all counsel of record.  (Certificate of Service, July 6, 2012, ECF No. 211-2).  Thereafter, the Court ordered the parties to submit a joint letter proposing dates for a proof hearing.  (Order, July 27, 2012, ECF No. 212).  Plaintiff submitted a letter offering possible dates, but noted that defendants did not jointly submit the letter because they had not filed an appearance, responded to the Complaint, or otherwise participated in the matter.  (Letter, July 27, 2012, ECF No. 213).

On August 7, 2012, the Court ordered that the parties appear for an in-person proof hearing on September 24, 2012.  (Order, Aug. 7, 2012, ECF No. 219).  On September 10, 2012, plaintiff filed a letter confirming that the September 24, 2012, in-person proof hearing had been converted to a telephone conference, notifying defendants via airmail by first class mail.  (Letter,

Sept. 10, 2012, ECF No. 220).  On September 21, 2012, the Court adjourned that telephone
conference to October 1, 2012.  Plaintiff notified each defendant via first class mail on
September 21, 2012, that the Court had rescheduled the September 24, 2012, telephone
conference to October 1, 2012.  Plaintiff also provided to defendants the telephone numbers and
identification numbers necessary for defendants to access and participate in that October 1, 2012,
telephone conference.  (Letter, Nov. 9, 2012, ECF No. 221; Exs. 1-3 to Affidavit of Service,
Nov. 9, 2012, ECF No. 221-1).  Accordingly, on October 1, 2012, the Court held a proof hearing,
on the record, via telephone conference, but defendants, despite being provided notice, did not
attend.

B.      **Factual Background in Support of Plaintiff's Application for Damages**

As an initial matter, plaintiff submits that "a majority of defaulting defendants are no
longer going concerns, making it impossible to present evidence on the issue of damages."  (Pl.'s
Br. in Support of Damages at 2, July 6, 2012, ECF No. 211).  Thus, plaintiff seeks to recover
damages from only iNetbet, Trenan, and Winward, the three defaulting defendants that "continue
to offer online gaming to wagerers in the United States."  (Id.).  Although iNetbet, Trenan, and
Winward are still "going concerns," plaintiff notes that it has been forced to "present such
evidence [of damages] without the benefit of any financial discovery from the defaulting
defendants."  (Id. at 1).  In fact, plaintiff's inability to obtain more complete discovery is part of
the reason that plaintiff seeks reasonable royalties.  (Id.).  As a result, plaintiff relies on publicly-
available information to draw inferences about the revenues that defendants have derived from
their respective infringements of plaintiff's '865 patent.  (Summerfield Decl., July 3, 2012, ECF
No. 211-1).

4

        i.      iNetbet

Through a Declaration of Counsel, George Summerfield, Esq., that is accompanied by exhibits, plaintiff states that iNetbet has provided gaming to New Jersey wagerers since 1999 through its online casino.  (Id. ¶¶ 1-2 & Exh. A).  A page from the iNetbet website states that "[t]o date iNetBet has safely and securely taken in millions of wagers and have seen over 350,000 joining and enjoying our game."  (Id. Exh. A.).  Plaintiff establishes that the progressive jackpot for slot machines alone on the iNetbet website exceeds $1 million.  (Id. ¶ 3; see Summerfield Decl., Ex. C, ECF No. 211-1).  A progressive jackpot is a jackpot (i.e., a payout) for a gaming machine where the value of the jackpot increases a small amount every time the game is played.  (See Pl.'s Br. in Support of Damages, July 6, 2012, ECF No. 211) (citing Friedman Decl. ¶ 42, July 21, 2011, ECF No. 166-1 in EH New Ventures).

        ii.     Trenan

Plaintiff submits that in July 2007, Trenan established its online casino, which accepts wagerers located in New Jersey.  (Summerfield Decl. ¶¶ 4-5, July 3, 2012, ECF No. 211-1; see Summerfield Decl., Exs. D-E, ECF No. 211-1).  Plaintiff establishes that Trenan's online casino offers more than $1 million in progressive slot jackpots.  (Summerfield Decl. ¶ 6, July 3, 2012, ECF No. 211-1; see Summerfield Decl., Ex. F, ECF No. 211-1).  In fact, a page downloaded from the Trenan website on or about May 18, 2012, indicates that the progressive jackpot as of that date was $5,225,350.33.  (Id. Exh. F).

        iii.    Winward

Plaintiff asserts that since 1998, Winward has owned thirteen online casinos that offer wagering to New Jersey gamblers.  (Summerfield Decl. ¶¶ 7-8, July 3, 2012, ECF No. 211-1; see

Summerfield Decl., Exs. G-H, ECF No. 211-1).  Further, plaintiff declares that the progressive

jackpot featured on one of Winward's online casinos on May 18, 2012, was more than $2

million.  (Summerfield Decl. ¶ 9, July 3, 2012, ECF No. 211-1; see Summerfield Decl., Ex. I,

ECF No. 211-1).  A page downloaded from the Winward website on or about May 18, 2012,

indicates that the progressive jackpot as of that date was $2,177,257.32.  (Id. Exh. I).


III.   **DISCUSSION**

Section 284 of the Patent Act provides:  "Upon finding for the claimant the court shall

award the claimant damages adequate to compensate for the infringement, but in no event less

than a reasonable royalty for the use made of the invention by the infringer . . . ."  35 U.S.C.

§ 284.  Damages is the amount of loss sustained by a patentee.  Smithkline Diagnostics, Inc. v.

Helena Lab. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991) (citations omitted).  If a patentee is

unable to prove actual damages (i.e., the amount of profits actually lost due to the infringing

activity), "the patentee is entitled to a reasonable royalty."  Id.  The period for which a royalty is

calculated begins at the later of the commencement of the infringing activity or six years prior to

the commencement of the suit.  See U.S.C. § 286.  A reasonable royalty, in effect, is a "floor

below which a damage award may not fall.[]"  Fromson v. W. Litho Plate & Supply Co., 853

F.2d 1568, 1574 (Fed. Cir. 1988).  Though denoted as a "royalty," it is still a determination of

"damages," and the existence of an established royalty helps a court ascertain a "reasonable"

royalty.  Id.; Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983)

(noting that a "reasonable royalty may be based upon an established royalty, if there is one").

Courts may ascertain a reasonable royalty by determining "the royalty to which a willing licensor

6

and a willing licensee would have agreed at the time the infringement began." Radio Steel & Mfg. Co. v. MTD Prods., Inc., 788 F.2d 1554, 1557 (Fed. Cir. 1986).  However, the methodology for determining a reasonable royalty falls ultimately within the court's discretion.  See Smithkline, 926 F.2d at 1164; cf. id. at 1164 n.2 (clarifying that a court does not have discretion to choose between basing an award on actual damages or on a reasonable royalty, but that it does have discretion on subsidiary issues such as choosing the methodology for determining a reasonable royalty).

Whether the patentee seeks actual damages or a reasonable royalty, "the amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence." Smithkline, 926 F.2d at 1164.  Further, "when the amount of the damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer." Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1065 (Fed. Cir. 1983); see also Trio Process Corp. v. L. Goldstein's Sons, Inc., 638 F.2d 661, 663 (3d Cir. 1981) (commenting that "it is often difficult in patent litigation to measure with mathematical precision a patentee's damages").  It follows that while damages "may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." Lam, 718 F.2d at 1065 (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)).

Here, plaintiff seeks a reasonable royalty from each defendant, rather than actual

damages.[1]  (See Pl.'s Br. in Support of Damages at 2-6, July 6, 2012, ECF No. 211; Summerfield

Decl. ¶¶ 10-11, July 3, 2012, ECF No. 211-1).  Therefore, the initial step in the inquiry is to

determine an appropriate method by which to calculate a "reasonable" royalty.  Plaintiff submits

that "[r]oyalty damages are calculated by multiplying the revenue from the infringing activity

(royalty base) by the appropriate royalty rate."  (Pl.'s Br. in Support of Damages at 3, July 6,

2012, ECF No. 211).  Plaintiff arrives at that methodology by relying substantially on Friedman's

expert opinion in the analogous case of EH New Ventures.  See generally 35 U.S.C. § 284 ("The

court may receive expert testimony as an aid to the determination of damages or of what royalty

would be reasonable under the circumstances.").  In EH New Ventures, plaintiff Lottotron sought

a reasonable royalty because the defaulting defendants in that case – like iNetbet, Trenan, and

Winward here – infringed Lottotron's '865 patent by "operation of their respective online

interactive gaming websites."  (Pl.'s Statement of Damages Due from Defaulting Defs. at 2, July

26, 2011, ECF No. 166 in EH New Ventures).

        In that case, Friedman provided an expert opinion on how to calculate a reasonable

royalty for Lottotron; specifically, he multiplied the royalty base – the estimated revenue the

defaulting defendants derived from the infringing activity – by the appropriate royalty rate.

(Friedman Decl. ¶¶ 40-45, July 21, 2011, ECF No. 166-1 in EH New Ventures ).  The Court in

EH New Ventures applied Friedman's royalty calculation method, and the Court here applies it

as well because it concludes that Friedman's methodology reasonably compensates plaintiff for

---

[1] At times in its brief, plaintiff uses interchangeably "damages" and "royalty" language.
(See Pl.'s Br. in Support of Damages at 3-6, July 6, 2012, ECF No. 211).  However, considering
the brief in its totality, the Court concludes that plaintiff seeks a reasonable royalty.  (See id. at 3-
4) (basing its analysis on the premise that "[a]n established royalty is usually the best measure of
a 'reasonable' royalty for a given use of an invention . . . .").

defendants' infringement.  See TWM Mfg. Co. v. Dura Corp., 789 F.2d 895, 899 (Fed. Cir.

1986) (noting that Section 284 does not limit a court's discretion "in choosing the analytical

approach to determine a reasonable royalty.  Section 284 does not mandate how the district court

must compute that figure, only that the figure compensate for the infringement."); see also

Mahurkar v. C.R. Bard, Inc., 79 F.3d 1572, 1579-80 (Fed. Cir. 1996) (holding that a royalty

needs to be only reasonable and that the "task [of determining a reasonable royalty] is simplified

when the record shows an established royalty for the patent in question or for related patents or

products").  As plaintiff argues in its application, the defaulting defendants did not provide

discovery, thereby preventing Lottotron from obtaining more particularized information

regarding the defaulting defendants' revenues.  These defendants had notice of Lottotron's

motion for default judgment and the subsequent hearing before the Court on damages, but did not

respond or participate in the matter.  Consequently, in the absence of additional financial

discovery or more precise revenue information, Friedman's royalty calculation method provides a

sufficient framework for the Court to ascertain a reasonable royalty for Lottotron.

To apply Friedman's royalty calculation method of multiplying the royalty base by a

reasonable royalty rate, the Court must first determine the method by which to calculate the

royalty base.  Plaintiff urges this Court to calculate each defendant's royalty base by using the

method espoused by Friedman in EH New Ventures.  (See Pl.'s Br. in Support of Damages at 4-

5, July 6, 2012, ECF No. 211; Summerfield Decl. ¶¶ 10-11, July 3, 2012, ECF No. 211-1).  In

EH New Ventures, the defaulting defendants – again, like iNetbet, Trenan, and Winward here –

failed to provide financial discovery.  (Friedman Decl. ¶ 2, July 21, 2011, ECF No. 166-1 in EH

New Ventures).  Because of that lack of financial information, Friedman drew inferences about

the defaulting defendants' revenues from publicly-available information to support Lottotron's application for damages (or, more accurately, its application for reasonable royalties).  (Id.).

First, Friedman measured the value of each defaulting defendant's progressive jackpot, finding:  1) Sun Casinos N.V. offered, among other casino-style online games, a progressive jackpot slot machine that often reached $1 million (Id. ¶¶ 3-7); 2) Bonne Chance N.V. operated a number of gaming websites and a wagerer won a progressive jackpot of more than $2.5 million from one of its sites in September 2009 (Id. ¶¶ 8-13); 3) 3A International N.V. owned Luck3 online casino, which had a minimum of $700,000 in progressive jackpots (Id. ¶¶ 14-18); 4) Pullman Gaming owned the Gold Club Casino wagering website, which featured progressive jackpots of more than $1 million  (Id. ¶¶ 19-22); 5) Allgames Casino Ltd. offered a variety of casino-type online games and wagerers won approximately $157,000 in two months' time  (Id. ¶¶ 23-26); 6) CB Corporation offered online casino games and advertised that it awarded approximately $57.5 million annually in prizes  (Id. ¶¶ 27-30); 7) i-Services N.V. offered a variety of casino-style online games and advertised that four of its progressive jackpots eclipsed $1 million  (Id. ¶¶ 31-35); and 8) Sonsorol, Ltd. offered online games and its progressive jackpots regularly reached $1 million (Id. ¶¶ 36-39).

Using those publicly-available progressive jackpot numbers, Friedman reasoned:

> Given that the progressive jackpot games offered by the defaulting defendants are only a portion of the games from which such defendants derive revenue, and given that such jackpots, according to public sources, often reach or exceed $1 million, it is reasonable to conclude that the defaulting defendants' annual revenues reach or exceed $10 million.  (Id. ¶ 42).

Friedman explained that progressive jackpots are funded typically as a percentage of total wagering volume, such as 1%.  (Id.).  For example, a jackpot that is "seeded" with $100,000 and

thereafter grows to $1 million in value has gained $900,000 over that time.  (Id.).

> If $900,000 represents 1% of total wagering volume, then the total wagering volume was $90,000,000.  A typical online casino may offer progressive slot machines at between 95% and 97% RTP (return to player), meaning that the casino keeps between 3% and 5% of total wagering volume.  Five percent of $90,000,000 is $4,500,000 in casino revenue for that particular progressive jackpot game during the particular time period in question.  Considering that many casinos offer multiple slot machine games with such jackpots, that jackpots may reach the $1,000,000 mark more than once per year, and that online casinos offer many popular games other than those with progressive jackpots (e.g. roulette and blackjack), it is very likely that the defaulting defendants' annual revenues were in excess of $10,000,000.  (Id.).

Assuming $10,000,000 in annual revenues, Friedman projected the estimated total revenue (i.e., the royalty base) that each defaulting defendant accrued during the period of time it infringed Lottotron's '865 patent.  (Id. ¶ 43).  For example, Friedman posited that Bonne Chance N.V.'s royalty base was $23,000,000, because that particular online casino earned $10,000,000 in annual revenues and infringed Lottotron's '865 patent for twenty-seven months.  (Id.).  Because defendants iNetbet, Trenan, and Winward have not provided financial discovery in this case, plaintiff asserts that the Court should adopt Friedman's method for calculating royalty bases. (See Pl.'s Br. in Support of Damages at 4, July 6, 2012, ECF No. 211) ("In this case, Lottotron was denied any discovery regarding the defaulting defendants' revenues from their infringing activities.  Thus, Lottotron's damages analysis necessarily depends upon any publicly available information regarding such revenues.").

Although plaintiff urges the Court to determine each defendant's royalty base by applying Friedman's calculation method, the Court in EH New Ventures ascertained the defaulting defendants' royalty bases by using a modified version of Friedman's proposed method

11

("Modified Royalty Base Calculation Method").  (See Tr. of Damages Hearing ("T"), Oct. 4,

2011, ECF No. 169 in EH New Ventures).  In its October 4, 2011, hearing on damages, the Court

in EH New Ventures changed two assumptions that Friedman had made in computing the

defaulting defendants' royalty bases.  (See T38:15-24; T43:12-15).  First, the Court directed

Friedman to assume that the defaulting defendants' progressive jackpots were funded at 1.5% of

total wagering volume, rather than 1%.  (T38:4-7).  The Court arrived at that 1.5% figure because

it was the average between the 1% and 2% funding assumptions that Friedman had posited

previously.  (See T13:4-25) ("[T]he way a progressive jackpot works, for [] a slot machine game

. . . is the jackpot grows, it progresses as a percentage of overall wagering volume . . . . [S]ome

percentage of overall wagering, [] goes to the pot . . . .  Oftentimes the percentage is around one

or maybe two percent of overall wagering volume.").  Second, the Court instructed Friedman to

assume that the defaulting defendants operated their progressive jackpots at 4% RTP, rather than

5% RTP.[2]  (T43:12-44:4).  The Court arrived at 4% RTP because it was the average between the

3% and 5% RTP figures that Friedman had posited previously.  (See T16:16-21) ("[M]ost of the

time you are having a pay back or what's known as RTP, return to player.  And that might be in

the three to five percent range.").

---

       [2] The Court instructed Friedman to assume 4% RTP, but it actually meant – and the parties understood it to mean – 96% RTP.  When a progressive jackpot is operated at 96% RTP, that means 96% of the total wagering volume on the game is "returned to the player."  Thus, the online casino keeps 4% of the total wagering volume when a game is operated at 96% RTP.  The Court called it 4% RTP, rather than its correct designation of 96% RTP, because it was focused on the percentage of total wagering volume that the online casino kept, in order to calculate the defaulting defendant's estimated revenue.  For purposes of consistency, and to focus on the amount of total wagering volume kept by the online casino, the remainder of this Report and Recommendation will refer to 95% RTP as 5% RTP; 96% RTP as 4% RTP; and 97% RTP as 3% RTP.

Finally, the Court adjusted upward those averages by 10% to account for the other online games offered by the defaulting defendants for which there was no readily ascertainable data on wagering volume or accrued revenue.  (T49:12-50:2).  Thus, in crafting its Modified Royalty Base Calculation Method, the Court instructed Friedman to calculate the royalty bases for the defaulting defendants by (1) assuming their progressive jackpots were funded at 1.5% of total wagering volume, plus an additional 10%, and (2) assuming their progressive jackpots were operated at 4% RTP (that is, with the casino keeping 4% of the total wagering volume on the game), plus the casino keeping an additional 10%.  (T50:23-51:4).  Friedman applied those metrics, arrived at a 67.2% ratio, and multiplied the original estimated revenues by 67.2% .  (T52:3-6).  For example, with respect to Bonne Chance N.V., Friedman multiplied the $23,000,000 figure (calculated originally by way of assuming that the online casino earned $10,000,000 in annual revenues and infringed Lottotron's '865 patent for twenty-seven months) by 67.2% to reach a royalty base of $19,488,000.  Friedman carried out that formula for each defaulting defendant, and the Court in <u>EH New Ventures</u> adopted each final calculation as the applicable royalty base for the corresponding defaulting defendant.

Here, the Court adopts the Modified Royalty Base Calculation Method that the Court in <u>EH New Ventures</u> used to determine the royalty bases for each defaulting defendant.  This method incorporates the crux of Friedman's expert opinion, while attempting to strike a measure of balance by settling on the midpoint (1.5%) of the 1-2% progressive jackpot funding range and the midpoint (4% RTP) of the 3-5% RTP range identified by Friedman in both <u>EH New Ventures</u> and in this case.  Further, the Modified Royalty Base Calculation Method adjusts those midpoint percentages upward by 10% to account for the various online games upon which revenue data

13

cannot be gleaned with reliable precision.  Here, such an upward adjustment by 10% is justified for each defendant.  iNetbet offers online games beyond its progressive jackpot, such as table games like Caribbean Hold'em Poker and Caribbean Stud Poker.  (See Summerfield Decl., Ex. C, ECF No. 211-1).  Trenan allows wagerers to download over 170 gambling games, in addition to its progressive jackpot slot machine.  (See Summerfield Decl., Ex. F, ECF No. 211-1).  And Winward owns thirteen online casinos that offer a plethora of gambling options, such as Bingo for Money and Instant Bingo.  (See Summerfield Decl., Ex. G, ECF No. 211-1).  Each defendant earns revenue from those online games, but the Court cannot ascertain precisely how much revenue.  Therefore, an upward adjustment of 10% of the progressive jackpot funding percentage and the RTP percentage is reasonable.  Applying the Modified Royalty Base Calculation Method, the Court finds the following royalty bases:

1.   iNetbet – $41,442,240 ($10,000,000 in annual revenues, multiplied by an infringement period of six years and two months, multiplied by 67.2%);

2.   Trenan – $21,840,000 ($10,000,000 in annual revenues, multiplied by an infringement period of three years and three months, multiplied by 67.2%); and

3.   Winward – $41,442,240 ($10,000,000 in annual revenues, multiplied by an infringement period of six years and two months, multiplied by 67.2%).

The next step in the inquiry is to determine an "appropriate" royalty rate to apply to defendants' royalty bases in order to ascertain a reasonable royalty that each defendant owes plaintiff.  On this issue, Friedman declared in EH New Ventures that "royalties for intellectual property in the online gaming space shows that such royalties regularly run 10% or more." (Friedman Decl. ¶ 40; see T31:12-25).  Friedman based that expert opinion on his personal experience in the industry and on his examination of Federal Trade Commission (FTC) filings by companies who had executed several large-scale licensing agreements, each of which granted the

14

patentee a percentage of revenue that rose from 10% to 35% or more over the span of the agreement.  (T31:21-32:21).  Consequently, Friedman picked 10% as a conservative estimate of a reasonable royalty.  (T32:21-22).  Given the low overhead attendant to online casino games, Friedman stated that a royalty rate of 10% was eminently reasonable.  (Friedman Decl. ¶ 41; see T36:3-18).  The Court in EH New Ventures accepted Friedman's rationale and determined that the 10% royalty rate was reasonable.  (T44:5-8) ("[The Court is] accepting your 10% royalty estimation as grounded in sufficient basis in fact to be a - - a reasonable estimate as distinguished from speculation.").

Here, Summerfield relies wholly on Friedman's analysis and applies a "conservative" royalty rate of 10% to the royalty base of each defendant.  (See Summerfield Decl. ¶¶ 10-11, July 3, 2012, ECF No. 211-1).  For the reasons articulated by Friedman in EH New Ventures, the Court here finds that a 10% royalty rate is indeed reasonable.  The Court applies that 10% rate to the royalty bases for iNetbet, Trenan, and Winward, and as such, finds that each defendant owes plaintiff the following royalties:

1.  iNetbet – $4,144,224 ($41,442,240 royalty base, multiplied by the reasonable royalty rate of 10%);

2.  Trenan – $2,184,000 ($21,840,000 royalty base, multiplied by the reasonable royalty rate of 10%); and

3.  Winward – $4,144,224 ($41,442,240 royalty base, multiplied by the reasonable royalty rate of 10%).

15

**IV.**    **CONCLUSION**

For the reasons stated above, it is respectively recommended that a judgment be entered against each of the defaulting defendants for damages in the following amounts:

1.    iNetbet – $4,144,224;
2.    Trenan – $2,184,000; and
3.    Winward – $4,144,224.

The parties have fourteen days to file and serve objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c)(2).

s/*Michael A. Hammer*
**UNITED STATES MAGISTRATE JUDGE**

Date:  November 16, 2012

16